1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    LESTER TUCKER,                              No.  2:20-cv-01620-DAD-KJN

12                   Plaintiff,

13           v.                                   ORDER GRANTING IN PART AND
                                                  DENYING IN PART DEFENDANTS'
14    CITY OF ELK GROVE, et al.,                  MOTION FOR SUMMARY JUDGMENT

15                   Defendants.                  (Doc. Nos. 13, 16)

16

17           This matter is before the court on the motion for summary judgment filed on behalf of

18    defendants City of Elk Grove, Elk Grove Police Department, Officer Jason Kenneth Miller, and

19    Officer Musa Fuad Abedrabbo (collectively, "defendants") on April 6, 2022.  (Doc. No. 13.)  The

20    pending motion was taken under submission without oral argument by the previously assigned

21    district judge on May 9, 2022.[1]  (Doc. No. 19.)  For the reasons explained below, defendants'

22    motion for summary judgment will be granted in part and denied in part.

23                                     **BACKGROUND**

24    **A.      Factual Background**

25           This case arises from the non-lethal shooting of plaintiff Lester Tucker by two law

26    enforcement officers after plaintiff, who was reportedly armed, ran away from the police during

27    _____

28    [1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 23.)

                                            1

their investigation of a possible trailer break-in on the streets of Elk Grove.

The facts leading up to the shooting are largely undisputed.[2]  Shortly after 11:00 p.m. on April 20, 2019, the Elk Grove Police Department received an anonymous call reporting a suspect fitting plaintiff's description breaking into a parked trailer.  (DUF ¶ 1.)  It was further reported by the anonymous caller that the individual had concealed a handgun beneath his sweatshirt (DUF ¶ 2) and that he was accompanied by a female (Doc. No. 13-3 at 2).  Two officers of the Elk Grove Police Department were dispatched to the scene:  defendant Officer Miller and defendant Officer Abedrabbo.  (Doc. No. 17-2 at 41.)  Defendant Abedrabbo, the assigned backup officer, arrived at the location first.  (*See* Doc. No. 13-8 at 3.)  When defendant Abedrabbo arrived on the scene, plaintiff was with another individual, Tessa Marker, and they were standing on the sidewalk with a dog on a leash.  (PUDF ¶ 9.)  Neither plaintiff nor Ms. Marker was in or touching the trailer.  (PUDF ¶ 12.)

Detectives from the Elk Grove Police Department interviewed the two defendant officers on April 23, 2019 as part of an investigation into the April 20, 2019 shooting incident.  (*See* Doc. Nos. 13-8; 13-11; 17-2 at 60–66.)  At this interview, defendant Abedrabbo mentioned having been surprised to see that plaintiff and Ms. Marker were still at the scene, stating, "[W]hen you get a call for this . . . usually they're not there especially this kind associated with the call where there's a possible, um, crime."  (Doc. No. 17-2 at 60.)  Similarly, defendant Miller stated in his interview that he was surprised when defendant Abedrabbo had radioed that the subjects were still on the scene:  "I wasn't really expecting them to be on scene just because if they're breaking into trailer . . . they . . . usually break in a trailer and they'd leave."  (Doc. No. 13-8 at 3.)  Defendant Miller stated that when he learned that the subjects were still present, he hurried to the scene in

---

[2]  In their statements of undisputed and disputed facts, the parties have omitted several important facts which are necessary to fully understand what occurred during the incident giving rise to this lawsuit.  Thus, in addition to deriving the facts from the undisputed facts as stated by defendants and responded to by plaintiff (Doc. No. 22-1 at 2–11 ("DUF")) and the undisputed and disputed facts as stated by plaintiff and responded to by defendants (*id.* at 11–19 ("PUDF")), the court provides the following factual background based on the exhibits filed in support of defendants' motion for summary judgment and plaintiff's opposition thereto.  (Doc. Nos. 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9, 13-10, 13-11, 13-12, 17-2).

order to provide backup to defendant Abedrabbo because the anonymous caller had reported seeing the suspect with a weapon.  (*Id.*)

Many of the events that occurred during the incident were captured to some extent on defendant Abedrabbo's body-worn camera (Doc. No. 13-4, "VA"), defendant Miller's body-worn camera (Doc. No. 13-5, "VM"), and the in-car camera recording from defendant Miller's vehicle (Doc. No. 13-6, "VC").  Defendant Abedrabbo's body-worn camera recorded his interaction with plaintiff, with audio, though not all of that video footage is clear.  Nonetheless, the footage does show that defendant Abedrabbo informed plaintiff and Ms. Marker that there had been a report of an individual tampering with the trailer which was parked next to them.  (VA at 00:45–00:48.)  Plaintiff explained that he was checking on the trailer for a friend.  (VA at 00:49–00:52.)  Defendant Abedrabbo then requested identification from plaintiff and Ms. Marker, to which plaintiff replied that they had not done anything wrong.  (VA at 1:04–1:08.)  Defendant Abedrabbo instructed plaintiff not to put his hands in his pockets and told plaintiff that the 911 caller mentioned seeing the suspect with a gun.  (VA at 1:15–1:21.)  Plaintiff replied that nobody had a gun.  (VA at 1:20–1:23.)  Defendant Abedrabbo then requested that plaintiff and Ms. Marker take a seat on the curb, and they complied.  (VA at 1:29–1:34.)  Approximately sixteen seconds later, plaintiff stood up, kissed Ms. Marker's forehead, and started running in the opposite direction from Officer Abedrabbo.  (VA at 1:50–1:53.)  As plaintiff was standing up, defendant Abedrabbo had told him to "have a seat" three times; plaintiff did not comply with that instruction.  (VA at 1:50–1:52.)

The parties agree that plaintiff, a convicted felon, ran away because he did in fact have a loaded handgun in his possession at that time and he knew that he could go back to prison because he was a convicted felon in possession of a firearm.  (DUF at ¶ 5.)  Before plaintiff ran, defendant Abedrabbo did not observe any illegal, threatening, or suspicious behavior on plaintiff's part.  (PUDF ¶ 11.)  Nor did defendant Abedrabbo observe any firearm.  (PUDF ¶ 13.)

Defendant Abedrabbo chased after plaintiff on foot and radioed in, "I got one running." (VA at 1:54–1:57.)  While chasing plaintiff, defendant Abedrabbo repeatedly yelled, "Get on the ground."  (VA at 2:00–2:26.)  Plaintiff testified at his deposition that he never heard defendant

Abedrabbo yelling to "stop" or "get on the ground" because he was too far away from him to hear anything. (Doc. No. 17-2 at 53.)

According to defendant Miller, he pulled up to the scene just before plaintiff fled. (Doc. No. 13-8 at 3.) As soon as plaintiff started running, defendant Miller pursued him in his vehicle. (*Id.*) About one minute into defendant Abedrabbo's foot chase, in an attempt to overtake plaintiff, defendant Miller drove past defendant Abedrabbo, who was still chasing plaintiff on foot. (DUF ¶ 8.) Defendant Miller said at his interview that when he drove past defendant Abedrabbo, he had a clear view of plaintiff running "with one arm moving in a running motion and the other arm kind of pinned against his body." (Doc. No. 13-8 at 3.) However, according to plaintiff, both of his arms were swinging back and forth in the typical fashion when one runs. (Doc. No. 17-2 at 6.)

Defendant Miller turned his police vehicle to his right, and the front of the vehicle briefly collided with plaintiff. (DUF ¶ 11.) In their statement of undisputed facts, defendants state, "Just prior to the collision, Officer Miller could see Tucker grabbing a dark object (gun) from under his hoodie." (DUF ¶ 12.) To support this assertion, defendants cite to screenshot 00914 from the in-car camera footage (*id.*) (citing Doc. No. 13-9 at 1), which depicts the moment defendant Miller struck plaintiff with his vehicle. (*Compare* Doc. No. 13-9 at 1 *with* VC at 00:31–00:32.)[3] However, screenshot 00914 merely depicts a black blur in plaintiff's left hand; it certainly does not show the object in plaintiff's hand to be a gun. (*See* Doc. No. 13-9 at 1.) Indeed, when viewing the in-car camera recording footage itself, as opposed to merely the screenshot, the court notes that the black object in plaintiff's left hand actually appears to have a floppy, cloth-like form, as opposed to any sort of rigid, solid shape. (VC at 00:31–00:32.)[4] In his declaration, plaintiff states that the item in his left hand was a black balaclava (Doc. No. 17-2 at 7), a cloth

---

[3] In support of this purported fact, defendants also cite to Miller's interview at page 002508, which is supposedly included in exhibit 6 of defense counsel Bruce Praet's declaration. (DUF ¶ 12) (citing Doc. No. 13-8). However, defendants did not include a page 002508 in their exhibit 6. (*See generally*, Doc. No. 13-8.)

[4] The video footage also shows that defendant Miller had observed plaintiff's hand for only one or two seconds. (*See* VC at 00:31–00:32.)

headgear which only exposes a part of the face.[5]  According to plaintiff's declaration, the collision with the police vehicle also caused him to drop his balaclava, leaving his left hand empty when he stood up.  (Doc. No. 17-2 at 6.)

At his deposition, plaintiff testified that being struck by the police vehicle caused him to fall onto his back and butt, resulting in him suffering injuries.  (*Id.* at 55.)  Plaintiff testified that after being hit by the police vehicle, he stood up in preparation to flee because he feared being arrested as a convicted felon in possession of a firearm.  (*Id.* at 55, 56.)  He also testified that after he stood up but before he could run, the officer who drove the vehicle that hit him got out, ran to the back of the vehicle, and then rushed toward plaintiff, firing shots at him.  (*Id.* at 56.)

Defendant Miller's body-worn camera shows him exiting his vehicle from the driver's seat door and moving toward the back of his vehicle.  (VM at 5:31–5:33.)  Approximately two seconds after defendant Miller exited the vehicle, just as he was rounding the driver's-side back corner of the vehicle, he shot plaintiff, who was standing next to the passenger side of the vehicle.  (*Id.*)  At that point, defendant Abedrabbo had just caught up to plaintiff, and plaintiff was facing away from defendant Abedrabbo and towards defendant Miller.  (VA at 2:23-2:27.)  Defendant Abedrabbo likewise shot plaintiff.  (*id.*; DUF ¶ 15.)

The parties purport to dispute a key fact:  whether plaintiff reached for his waistband or sweatshirt pocket immediately before being shot.  Plaintiff testified at his deposition and stated in his declaration that at no time did he reach for his waistband or gun.  (Doc. No. 17-2 at 6, 57.)  Defendants, on the other hand, assert in their statement of undisputed facts that the defendant officers saw plaintiff reach for his waistband.  First, defendants assert:  "As Officer Miller exited his police vehicle, Tucker reached for his waistband and Miller fired."  (DUF ¶ 14.)  Because of the grainy nature of the video footage and screenshots that defendants cite in support of this asserted fact, the court cannot find that the evidence substantiates defendants' assertion that plaintiff was reaching for his waistband.  (*See* VM at 5:34; VA at 2:26; Doc. No. 13-10.)  Next,

---

[5]  Defendant Abedrabbo's body-camera footage does show that when he was first talking with plaintiff and Ms. Marker, plaintiff was carrying a cell phone in his right hand and a dark cloth-like item in his left hand.  (VA at 1:17.)

1    defendants assert: "Seeing Tucker reach for his waistband and hearing a gunshot, Officer

2    Abedabbo [sic] fired." (DUF ¶ 15.)  Defendants cite page 002494 of defendant Abedrabbo's

3    interview transcript to support this asserted fact. (*Id.*) (citing Doc. No. 13-11.)  Yet, nowhere on

4    that page of the transcript does defendant Abedrabbo state that he saw plaintiff reaching for his

5    waistband or that he heard a gunshot. (*See* Doc. No. 13-11 at 3.)

6         Another officer, Officer Cristina Gonzalez, arrived on scene shortly after the defendant

7    officers shot plaintiff. (*See* Doc. No. 17-2 at 41.)  According to her incident report, plaintiff was

8    laying on the ground where defendant Miller had him at gun point when Officer Gonzalez

9    handcuffed plaintiff and located a small automatic handgun tucked under plaintiff's shirt and

10   sweatshirt on his right side. (*Id.*)  On June 9, 2020, after an internal administrative investigation,

11   Lieutenant Ryan Elmore at the Elk Grove Police Department exonerated both officers with

12   respect to the shooting in accordance with police department policy. (*Id.* at 68–69.)

13   **B.    Procedural Background**

14        On August 12, 2020, plaintiff filed the complaint initiating this civil action against

15   defendants. (Doc. No. 1.)  In his complaint, plaintiff asserts a constitutional claim under 42

16   U.S.C. § 1983 against all defendants for allegedly violating his rights under the Fourth

17   Amendment by unlawfully seizing him. (*Id.* at 5.)  In addition, plaintiff brings the following state

18   law claims against all defendants: (1) violation of Article I § 13 of the California Constitution;

19   (2) violation of California Civil Code § 43; (3) violation of the Bane Act, California Civil Code §

20   52.1; (4) negligence; and (5) battery. (*Id.* at 6.)

21        On April 6, 2022, defendants filed the pending motion seeking summary judgment in their

22   favor as to all of plaintiff's claims. (Doc. No. 13.)  Specifically, as to plaintiff's § 1983 claim

23   against the defendant officers, defendants argue that they did not violate plaintiff's constitutional

24   rights, and that even if they did, they are entitled to qualified immunity. (*Id.* at 13–18.)  As to

25   plaintiff's other claims, defendants argue that they are entitled to summary judgment because

26   plaintiff has failed to come forward with evidence establishing the requisite elements of those

27   claims. (*See id.* at 18–23.)  On April 29, 2022, plaintiff filed an opposition to the pending motion,

28   /////

1    and on June 13, 2022, defendants filed their reply thereto.  (Doc. Nos. 17, 22.)[6]

2                                    **LEGAL STANDARD**

3            Summary judgment is appropriate when the moving party "shows that there is no genuine

4    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

5    Civ. P. 56(a).

6            In summary judgment practice, the moving party "initially bears the burden of proving the

7    absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

8    (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

9    may accomplish this by "citing to particular parts of materials in the record, including

10   depositions, documents, electronically stored information, affidavits or declarations, stipulations

11   (including those made for purposes of the motion only), admissions, interrogatory answers, or

12   other materials," or by showing that such materials "do not establish the absence or presence of a

13   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

14   Fed. R. Civ. P. 56(c)(1)(A), (B).

15           Where the party moving for summary judgment will bear the burden of proof at trial, as is

16   the case here with respect to defendants' affirmative defense of qualified immunity, that party

17   must come forward with evidence that would entitle it to a directed verdict if the evidence were

18   uncontroverted at trial.  *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *see also*

19   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Where the moving party

20   will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

21   no reasonable trier of fact could find other than for the moving party.")

22           When the non-moving party bears the burden of proof at trial, "the moving party need

23   only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle*

24   *Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).

25   Indeed, after adequate time for discovery and upon motion, summary judgment should be entered

26   _____

27   [6]  With his opposition to the pending motion for summary judgment, plaintiff filed a separate
     "motion to strike" (Doc. No. 16), which is not procedurally proper, and in any event consists of
     objections to certain of defendants' evidence.  Therefore, the court will construe that motion as

28   plaintiff's objections to defendants' evidence and will address those objections in this order.

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

8

1    *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

2    obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v.*

3    *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902

4    (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

5    simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

6    taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

7    'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

8    **ANALYSIS**

9    **A.**      **Plaintiff's Objections to Defendants' Evidence**

10           In connection with his opposition to the pending motion for summary judgment, plaintiff

11    filed objections to certain evidence presented by defendants.  (Doc. No. 16.)  Specifically,

12    plaintiff objects to the excerpts of transcripts of audio-recorded interviews of defendant Officer

13    Miller (Doc. No. 13-8) and defendant Officer Abedrabbo (Doc. No. 13-11), which are included as

14    exhibits 6 and 9 to defense counsel's declaration (Doc. No. 13-2).  (Doc. No. 16 at 3.)

15           First, plaintiff objects to the transcript excerpts on the ground that they have not yet been

16    properly authenticated and because the "best evidence" of what the officers said in their audio-

17    recorded interviews are the audio recordings themselves.  (Doc. No. 16 at 3–4.)  At summary

18    judgment, evidence must be authenticated by affidavits or declarations of persons with personal

19    knowledge through whom they could be introduced at trial.  *Zoslaw v. MCA Distrib. Corp.*, 693

20    F.2d 870, 883 (9th Cir. 1982).  Moreover, "[a] district court may consider inadmissible evidence

21    as long as the evidence could be presented in an admissible form at trial."  *Fraser v. Goodale*, 342

22    F.3d 1032, 1036–37 (9th Cir. 2003); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666

23    (9th Cir. 2021).  Specifically, here, plaintiff argues that defendants' attorney's declaration that the

24    transcripts were "true and accurate" copies did not properly authenticate the transcripts because

25    defense counsel lacks the personal knowledge necessary to do so.  (Doc. No. 16 at 4) (citing *Orr*,

26    285 F.3d at 776–77).  Plaintiff does not dispute the authenticity of either transcript; he merely

27    contends that defense counsel did not sufficiently authenticate them.  Notably, plaintiff relies on

28    /////

1    many of the same interview transcript excerpts as evidence in support of his opposition to the

2    motion for summary judgment.  (*See* Doc. No. 17-2 at 60–66.)

3           Nevertheless, in connection with their opposition to plaintiff's evidentiary objections,

4    defendants cured any arguable defect by submitting:  (1) defendant Miller's declaration that,

5    based on his personal knowledge, exhibit 6 is an accurate transcript of his interview (Doc. No. 18-

6    1); and (2) defendant Abedrabbo's declaration that, based on his personal knowledge, exhibit 9 is

7    an accurate transcript of his interview (Doc. No. 18-2).  This is evidence "sufficient to support a

8    finding that the item is what the proponent claims it is."  *See* Fed. R. Evid. 901(a).  Furthermore,

9    both plaintiff's authentication and best evidence objections are unavailing because the facts

10   underlying the transcript excerpts could be presented in an admissible form at trial through

11   defendants' live testimony and can thus be considered by the court on summary judgment.  *See*

12   *Fraser,* 342 F.3d at 1037; *see also Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992)

13   (holding that an affidavit could be considered on summary judgment, despite hearsay and best

14   evidence rule objections, because the underlying facts of the affidavit would be admissible at

15   trial); *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1232 (N.D. Cal. 2018) ("[D]istrict courts in

16   this circuit have routinely overruled authentication and hearsay challenges at the summary stage

17   where the evidence could be presented in an admissible form at trial, following *Fraser*.").[7]

18

19   ─────────────────
     [7]  Some courts have concluded that this relaxed standard under *Fraser* applies only to the non-
20   moving party.  *See, e.g., Cook v. Lee*, No. 17-cv-02569-PHX-DGC, 2019 WL 2525373, at *3 n.3
     (D. Ariz. June 19, 2019) ("[T]his focus on the content over the form of evidence at the summary
21   judgment stage applies to the nonmovant[.]"); *United States v. Pac. Health Corp.*, No. 12-cv-
     00960-RSWL-AJW, 2018 WL 1026361, at *6 n.5 (C.D. Cal. Feb. 20, 2018) ("Exhibits offered 'in
22   a form not admissible in evidence may be used to avoid, but not to *obtain* summary judgment.'")
     (citations omitted).  However, the Ninth Circuit has itself applied the *Fraser* principle to allow
23   consideration of inadmissible evidence submitted by the moving party at summary judgment so
     long as that evidence can ultimately be presented in an admissible form at trial.  *See Jeffries v.*
24   *Las Vegas Metro. Police Dep't*, 713 Fed. App'x 549, 550 (9th Cir. 2017) (holding the district
     court did not err in considering the moving party's exhibits, stating that "a district court may
25   consider inadmissible evidence as long as the evidence could be presented in an admissible form
     at trial") (citing *Fraser* 342 F.3d at 1036–37).  The court finds *Jeffries* to be persuasive authority
26   that the *Fraser* standard applies to both the moving and the non-moving party.  *See* 713 Fed.
     App'x at 550; *see also Enriquez v. Gemini Motor Transp. LP*, No. 19-cv-04759-PHX-GMS, 2021
27   WL 5908208, at *2–3 (D. Ariz. Dec. 14, 2021) (concluding that *Fraser* applies to a moving
     party's evidentiary submissions on summary judgment).
28

Second, plaintiff objects to the transcripts of defendants' interviews on the grounds that they constitute hearsay.  (Doc. No. 16 at 5.)  Plaintiff argues that the transcripts constitute two levels of hearsay, the first being that "[d]efendants proffer their own self-serving unsworn statements made outside of court to prove the officers' version of what supposedly occurred," and the second being that "the transcript excerpts purport to represent, for the truth of the matter asserted therein, the actual contents of the officers' audio recorded interviews."  (Doc. No. 16 at 5.)  The court finds that the defendant officers' statements are not inadmissible hearsay with regard to their contents because the defendant officers could testify as witnesses at trial.  *See Cherewick*, 578 F. Supp. 3d at 1157 ("[A]s long as a court finds that hearsay evidence could be presented in an admissible form at trial . . . , it may consider the evidence when ruling on the motion for summary judgment.").

Because the court concludes that the officers' interview statements can be presented in an admissible form at trial, i.e., by their live testimony, the court may consider the contents of the interview transcripts in addressing the pending summary judgment motion.  *See Fraser*, 342 F.3d at 1037; *see also Sandoval*, 985 F.3d at 666 ("If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment.").  Accordingly, plaintiff's objections to defendants' evidence will be overruled.

**B.    Defendants' Motion for Summary Judgment on Plaintiff's Claims**

1.    Fourth Amendment Excessive Use of Force Claim:  Individual Liability

Defendants move for summary judgment in their favor as to plaintiff's 42 U.S.C. § 1983 excessive use of force claim, in which plaintiff alleges that defendants violated the Fourth Amendment by shooting him.  (Doc. No. 13 at 13–18.)  Defendants so move on two grounds.  (*See id.*)  First, defendants contend that under the undisputed evidence on summary judgment, the defendant officers' use of force was "objectively reasonable under the circumstances," and thus plaintiff cannot establish the requisite use of unreasonable force.  (*Id.* at 13.)  Second, defendants argue that they are entitled to judgment in their favor on qualified immunity grounds.  (*Id.* at 15.)

11

1   Because defendants' argument that the defendant officers' conduct was "objectively reasonable"

2   (*id.* at 13) is part of the qualified immunity analysis, the court will not address it separately.

3           Under § 1983, a private right of action exists against anyone who, "under color of" state

4   law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities

5   secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "Section 1983 does not create

6   substantive rights; it merely serves as the procedural device for enforcing substantive provisions

7   of the Constitution and federal statutes."  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991)

8   (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).  State officials are

9   entitled to qualified immunity from a § 1983 suit unless "(1) they violated a federal statutory or

10  constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the

11  time.'"  *District of Columbia v. Wesby*, ─── U.S. ───, 138 S. Ct. 577, 589 (2018) (quoting

12  *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

13          Here, "[b]ecause the moving defendant bears the burden of proof on the issue of qualified

14  immunity, he or she must produce sufficient evidence to require the plaintiff to go beyond his or

15  her pleadings.  The defendant's burden is to demonstrate the absence of a genuine issue of

16  material fact."  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) (internal citation omitted).

17              a.      *Step One:  Whether a Constitutional Right Was Violated*

18          Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

19  houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

20  no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

21  Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

22  which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see*

23  *also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

24  Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

25  or show of authority, in some way restrains the liberty of a citizen.").

26          Plaintiff's § 1983 claim for the excessive use of force in violation of the Fourth

27  Amendment is governed by an "objective reasonableness standard."  *Graham v. Connor*, 490 U.S.

28  386, 388 (1989) (internal quotation marks omitted).  This standard requires a "careful balancing

                                                    12

of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.  Reasonableness in this context is to be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997), *as amended* (Oct. 9, 1997).  Indeed, the Ninth Circuit has repeatedly recognized that "summary judgment should be granted sparingly in excessive force cases." *Gonzalez*, 747 F.3d at 795; *see also Seidner v. de Vries,* 39 F.4th 591, 601 (9th Cir. 2022); *Estate of Lopez ex rel. Lopez v. Gelhaus,* 871 F.3d 998, 1006 (9th Cir. 2017); *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016); *Green v. City of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014); *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").  Thus, while it is true that officers "are often forced to make split-second judgments," "it is equally true that even where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d at 853 (citations omitted).  In the final analysis, "[f]orce is excessive when it is greater than is reasonable under the circumstances." *Id.* at 854 (citing *Graham*, 490 U.S. at 395).

Here, on one side of the balancing scale, the "nature and quality of the intrusion" were the most intrusive possible:  the defendant officers used deadly force in shooting plaintiff.  *See Seidner*, 39 F.4th at 596 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005)) ("Some uses of force can be quantified categorically.  The best example is shooting a firearm, which by definition is 'deadly force':  force that 'creates a substantial risk of causing death or serious bodily injury.'").

1    On the other side of the scale is the countervailing governmental interests at stake.  In

2  *Graham*, the Supreme Court listed several factors to be considered in determining the

3  government's interest in the force it used:  (1) "the severity of the crime at issue," (2) "whether

4  the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the

5  suspect] is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  The

6  threat element is the most important consideration, and "[a]n officer's use of deadly force is

7  reasonable only if 'the officer has probable cause to believe that the suspect poses a significant

8  threat of death or serious physical injury to the officer or others.'"  *Gonzalez v. City of Anaheim*,

9  747 F.3d 789, 793 (9th Cir. 2014) (quoting *Garner*, 471 U.S. at 3); *see also S.R. Nehad v.*

10 *Browder*, 929 F.3d 1125, 1132–33 (9th Cir. 2019).  The question on summary judgment "is

11 whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat

12 of death or serious physical injury at the time he shot" the plaintiff.  *Gonzalez*, 747 F.3d at 794.

13 Here, defendants argue that the available evidence on summary judgment could lead a reasonable

14 jury to only one conclusion:  the officers reasonably perceived that plaintiff posed an immediate

15 threat to their life and safety.  (Doc. No. 13 at 14–15.)

16    In assessing the governmental interests at stake to determine whether they justify the use

17 of deadly force, the court begins with the "most important" *Graham* factor:  whether plaintiff

18 posed a threat to the officers or the public.  *See Gonzalez*, 747 F.3d at 793.  The court will analyze

19 this factor as to each defendant officer in turn.  Because the court finds consideration of this factor

20 dispositive on summary judgment, the court will not address the other *Graham* factors, nor

21 complete the balancing test prescribed by *Graham*.

22                    i.        Defendant Abedrabbo

23    Defendants argue that defendant Abedrabbo shot plaintiff because he reached for his

24 waistband, contending that an officer may use deadly force against a person who is armed, or

25 reasonably suspected of being armed, when he reaches for his waistband.  (Doc. No. 13 at 14.)

26 The case law supports defendants' statement of the law.  For instance, the Ninth Circuit has held

27 that "[i]t would be unquestionably reasonable for police to shoot a suspect in [plaintiff's] position

28 if he reaches for a gun in his waistband, or even if he reaches there for some other reason."  *Cruz*

1   *v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014).  But to accept defendants' contention

2   that defendant Abedrabbo's actions were objectively reasonable as a matter of law, the court

3   would have to find that under the undisputed evidence, defendant Abedrabbo reasonably believed

4   that plaintiff was reaching for his waistband.  However, there is simply no evidence before the

5   court on summary judgment to support such a finding.

6        The only evidence that defendants have cited in support of their assertion that "[s]eeing

7   Tucker reach for his waistband and hearing a gunshot, Officer Abedabbo [sic] fired" was

8   defendant Abedrabbo's interview at page 002494.  (DUF ¶ 15.)  But, as discussed above, page

9   002494 of the interview does not support this assertion whatsoever.  Of course, it is possible that

10  the assertion might find some support elsewhere in the evidence submitted on summary judgment.

11  However, courts are not required to scour the summary judgment record to piece together the

12  facts of the case.  As has often been recognized, "[j]udges are not like pigs, hunting for truffles

13  buried" in the record.  *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (quoting *United

14  States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *see also Keenan v. Allan*, 91 F.3d 1275,

15  1279 (9th Cir. 1996) (noting that "[i]t is not our task, or that of the district court, to scour the

16  record in search of a genuine issue of triable fact") (citation omitted).  As the moving party

17  bearing the burden of proof, defendants have simply failed to establish that it is undisputed that

18  defendant Abedrabbo reasonably believed that plaintiff was reaching for his waistband.

19       Nor does the body-worn camera footage evidence before the court support defendants'

20  purported fact that defendant Abedrabbo reasonably believed he saw plaintiff reaching for his

21  waistband.  Defendant Abedrabbo's body-worn camera footage shows that when defendant

22  Abedrabbo shot plaintiff, he had only just caught up to him and plaintiff was facing away from

23  Abedrabbo such that plaintiff's hand movements were not clearly visible to the officer.  Again,

24  defendants therefore have not established the absence of a genuine dispute of material fact as to

25  whether defendant Abedrabbo reasonably believed that plaintiff reached for his waistband or

26  made any other furtive movements suggesting that he posed an imminent threat to the safety of

27  the officers or others.

28  /////

15

In its decision in *Cruz*, the Ninth Circuit made clear that an officer may shoot a suspect reaching for his waistband, but the court also went on to observe that "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him[.]"  765 F.3d at 1078–79; *see also Peck v. Montoya*, 51 F.4th 877, 887–88 (9th Cir. 2022) (acknowledging that officers may not "kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed" and noting that "[w]e have repeatedly distinguished between a suspect who is actively reaching for a weapon and a suspect who is armed but not reaching for the weapon.") (citations omitted).  There is a lack of evidence presented by defendants, and it is coupled with defendants' failure to cite evidence that actually supports their version of the undisputed facts.  In short, the evidence before the court on summary judgment does not establish that defendant Abedrabbo had "probable cause to believe that [plaintiff] pose[d] a significant threat of death or serious physical injury to the officer or others."  *Gonzalez*, 747 F.3d at 793.  Rather, the question of whether defendant Abedrabbo saw what he believed to be plaintiff reaching for his waistband is a disputed material fact.  Thus, the court cannot determine as a matter of law, based on the evidence before it on summary judgment, that defendant Abedrabbo's use of force was reasonable or that he is entitled to qualified immunity on that basis.

ii.    Defendant Miller

Here too, the court will begin with the "immediate threat" inquiry.  Critically, there is also a genuine dispute of material fact regarding whether plaintiff was reaching for his waistband immediately before he was shot, thus precluding the granting of summary judgment in favor of defendant Miller.

Defendants point to video footage evidence in support of their assertion that defendant Miller shot plaintiff because he saw plaintiff reach for his waistband.  However, as discussed above, because of the grainy nature of the videos and screenshots that defendants have cited in support of this asserted fact, it is impossible to determine from that evidence whether plaintiff was reaching for his waistband.  Plaintiff testified and stated in his declaration that he did not reach for his waistband or gun at any time before he was shot by police.  In determining whether defendant

16

1    Miller is entitled to summary judgment on qualified immunity grounds, the court must credit

2    plaintiff's deposition testimony and declaration that he did not reach for his waistband because

3    plaintiff's version of the events is certainly not "blatantly contradicted by the record." *See Gomez*

4    *v. Fachko*, No. 19-cv-05266-LHK, 2021 WL 1721067, at *9 (N.D. Cal. Apr. 30, 2021) ("In

5    weighing whether an officer is entitled to qualified immunity at summary judgment, the Court

6    'must construe the facts in the light most favorable to the plaintiff.'  Specifically, as the Ninth

7    Circuit has explained, the Court must credit plaintiff's version of events unless it is 'blatantly

8    contradicted by the record, so that no reasonable jury could believe it.'") (quoting *Orn v. City of*

9    *Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020)).

10         Furthermore, in their statement of undisputed facts, defendants assert that just prior to

11   defendant Miller's vehicle colliding with plaintiff, defendant Miller could see plaintiff grabbing a

12   dark object from under his sweatshirt, citing the in-car camera footage evidence.  (DUF ¶ 12)

13   (citing Doc No. 13-9 at 1).  However, while the video footage itself captures a fleeting glimpse of

14   what the court perceives as a dark cloth-like item in plaintiff's hand, the video clip itself is

15   extremely brief and quite difficult to discern.  Notably, plaintiff states in his declaration that the

16   dark object seen in that footage was a black balaclava, which he dropped when he was struck by

17   defendant Miller's vehicle.  (Doc. No. 17-2 at 7.)  Viewing this evidence in the light most

18   favorable to plaintiff, a reasonable jury could certainly conclude from this evidence that it was

19   unreasonable for defendant Miller to believe that plaintiff posed an immediate threat to the safety

20   of the defendant officers or others when he shot him.  *See Est. of Diaz v. City of Anaheim*, No. 12-

21   cv-01897-JVS-RNB, 2013 WL 12207504, at *5 (C.D. Cal. Dec. 18, 2013) ("[I]f Diaz did not

22   have an object resembling a gun in his hand, if he discarded the object before Officer Bennallack

23   shot . . . a reasonable jury could find no immediate threat to the Officers' safety existed.").

24         Confusingly, despite citing to evidence of plaintiff holding a dark object in his hand and

25   asserting in a parenthetical that the object was a "(gun)," defendants do not argue in their pending

26   motion for summary judgment that defendant Miller witnessed the presence of a dark item in

27   plaintiff's hands at the time he actually fired his weapon, or that that was the reason he shot at

28   /////

17

plaintiff.[8]  Instead, they argue that defendant Miller saw plaintiff *reaching* for a weapon at his waistband, and that is why he shot plaintiff.  (Doc. No. 13 at 14.)  Either way, there remains a genuine dispute of material fact on the question of whether defendant Miller reasonably believed he saw plaintiff reaching for his waistband.  This critical dispute—which is the crux of defendants' contention that defendant Miller's use of force was objectively reasonable—precludes the granting of summary judgment in defendant Miller's favor on qualified immunity grounds.  *See Cruz*, 765 F.3d at 1079–80 (holding that summary judgment in the defendant officers' favor was precluded by disputed factual issues regarding whether the suspect—a known gang member whom officers had been told was carrying a gun in his waistband—had reached for his waistband just before being shot, despite officers' testimony that the suspect had reached for his waistband).

In sum, viewing the evidence in the light most favorable to plaintiff, as the court must do at this stage of the case, defendant Miller has not established that his use of force was objectively reasonable such that he is entitled to qualified immunity.[9]

           b.    *Step Two:  Whether the Constitutional Right Was Clearly Established*

Even if a reasonable jury could find that the defendant officers violated plaintiff's Fourth Amendment right against the use of excessive force, the officers would be entitled to judgment in their favor on qualified immunity grounds if the right was not clearly established at the time of the

---

[8]  Nor does it seem could defendants make such an argument in light of the evidence that after plaintiff was shot by defendants and was laying on the ground being held at gun point by defendant Miller, Officer Gonzalez handcuffed plaintiff and located a small automatic handgun still tucked in the right side of plaintiff's waistband under his shirt and sweatshirt.  (Doc. No. 17-2 at 41.)

[9]  Because there is a genuine dispute of material fact precluding the court from resolving this factor on summary judgment, the court need not consider the remaining *Graham* factors, nor can the court complete the balancing test required under *Graham*.  *See, e.g., Goodlow v. City of El Cajon*, No. 13-cv-01524-DMS-NLS, 2015 WL 11251804, at *3 (S.D. Cal. Jan. 20, 2015) (denying summary judgment in the defendants' favor as to the plaintiff's excessive use of force claim, finding that there was a genuine dispute of fact regarding whether the plaintiff reached his hands toward his waistband); *Sommers v. City of Santa Clara*, 516 F. Supp. 3d 967, 981–83 (N.D. Cal. 2021) (denying summary judgment in the defendants' favor as to the plaintiff's excessive use of force claim, finding that there were genuine disputes of fact regarding whether the plaintiff posed an immediate threat to the officers and public and finding itself unable to complete the balancing test required under *Graham*).

encounter.  *See C.V. ex rel. Villegas*, 823 F.3d at 1257.  "A Government official's conduct

violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a]

right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he

is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011*)* (alterations in

original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Wesby*, 138 S. Ct.

at 589.  "We do not require a case directly on point, but existing precedent must have placed the

statutory or constitutional question beyond debate."  *Wesby*, 138 S. Ct. at 590 (quoting *Ashcroft,*

563 U.S. at 741); *see also Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019*)*.

It is not appropriate for courts to define clearly established law at a high level of

generality; instead, the inquiry "must be undertaken in light of the specific context of the case, not

as a broad general proposition."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted); *see

also Wesby*, 138 S. Ct. at 590.  "Such specificity is especially important in the Fourth Amendment

context, where . . . [i]t is sometimes difficult for an officer to determine how the relevant legal

doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Mullenix*,

577 U.S. at 12 (internal quotation marks and citation omitted); *see also Peck*, 51 F.4th at 891.

In this case, plaintiff has pointed to evidence that raises a disputed issue of material fact

regarding whether the defendant officers saw plaintiff reach for his waistband just before he was

shot.  Viewing the evidence before the court on summary judgment in the light most favorable to

plaintiff, a reasonable jury could find that plaintiff did not reach for his waistband.  Assuming that

version of the facts to be true, the defendant officers' actions violated clearly established law.  As

noted above, the Ninth Circuit has repeatedly held that officers cannot use deadly force against a

suspect who does not threaten them with a weapon, even if a weapon is within the suspect's reach

at the time.  *See Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)

(holding that officers could not use deadly force to shoot a fleeing armed suspect who was not

pointing a gun at the officers and was not facing them); *Gelhaus*, 871 F.3d at 1020 (specifically

recognizing that the 1991 decision in *Curnow* gave "'fair notice' that the use of deadly force is

unreasonable where the victim does not directly threaten the officer with the gun"); *see also id.* at

1010, 1021 (affirming the district court's denial of the defendants' motion for summary judgment

1   on qualified immunity grounds where the suspect had a gun in his hand with the barrel pointing

2   towards the ground); *see also Peck*, 51 F.4th at 887, 888 (determining that officers who shot a

3   suspect were not entitled to qualified immunity at summary judgment where, in drawing all

4   reasonable inferences in the plaintiff's favor, the suspect was in the presence of a gun but never

5   picked it up and was moving away from it when he was shot); *George v. Morris*, 736 F.3d 829,

6   838 (9th Cir. 2013) (affirming the district court's denial of the defendants' motion for summary

7   judgment on qualified immunity grounds where the suspect held a gun with the barrel pointed

8   downward, without pointing it at the officers or engaging in threatening behavior).

9          Furthermore, in his opposition to the pending motion for summary judgment, plaintiff

10  cites to the Ninth Circuit's decision in *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)

11  (Doc. No. 13 at 17), a decision which this court finds to be highly relevant and directly applicable

12  to the present case.  In that case, the Ninth Circuit considered the reasonableness of officers

13  "opening fire" on a suspect whom officers had pursued for suspected criminal activity, who was

14  reported to be carrying a gun in his waistband, and who was "surrounded by officers with guns

15  drawn."  *Cruz*, 765 F.3d at 1078, 1079.  According to the officers' accounts, the suspect "ignored

16  [the officers'] commands and instead reached for the waistband of his pants."  *Id.*  Nonetheless,

17  the Ninth Circuit reversed the district court order granting summary judgment in the officers'

18  favor, holding that a genuine factual dispute existed as to whether the officers saw the suspect

19  reach for his waistband such that he posed an immediate threat at the time the officers shot him.

20  *Id.* at 1079–1080.  As noted above, the Ninth Circuit stated that "[i]t would be unquestionably

21  reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband,

22  or even if he reaches there for some other reason," especially "[g]iven Cruz's dangerous and

23  erratic behavior up to that point."  *Id.*  at 1078.  But the court went on to say that "[c]onversely, if

24  the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would

25  clearly be unreasonable for the officers to shoot him[.]"  *Id.*  Thus, the Ninth Circuit's decision in

26  *Cruz* established beyond any doubt that officers may not use deadly force against individuals who

27  are presumed to have a gun but do not reach for it or make any other movements indicating an

28  imminent threat to the officers or the public.  *See id.*; *see also Peck*, 51 F.4th at 888 ("*Cruz*

1  establishes that officers may not fire at a suspect—even an armed suspect—absent some reason to

2  believe that the suspect will soon access or use the weapon.")[10]

3        Even more recently, the Ninth Circuit reviewed a similar case and affirmed the lower

4  court's determination that the defendant officers were not entitled to qualified immunity on

5  summary judgment where the officers shot plaintiff, who was armed and running away from

6  them, and it was disputed whether the plaintiff reached for his pocket or gun.  *See Edmond v.*

7  *Lockwood*, No. 22-55024, 2023 WL 2423340 at *1 (9th Cir. Mar. 9, 2023).[11]  In *Edmond*, the

8  Ninth Circuit cited five Ninth Circuit decisions (all of which were decided before the shooting of

9  plaintiff in this case), and held that it was "clearly established law" that officers "may not use

10  deadly force on an individual who has not acted threateningly at any time during or prior to the

11  encounter, even if they believe the individual has a firearm . . . [and] even where the suspect is

12  fleeing on foot."  *Id.* (citations omitted).

13        In light of these binding Ninth Circuit decisions, the granting of summary judgment in the

14  defendant officers' favor is not appropriate here because their entitlement to qualified immunity

15  depends on disputed factual issues which must be resolved by the trier of fact.  *See Peck,* 51 F.4th

16  at 888 (affirming the denial of summary judgment on qualified immunity grounds because

17  "where, as here, a jury could find that no such movement occurred, our cases clearly establish that

18

19  [10]  In *Peck*, the Ninth Circuit concluded its analysis with the following:

20              To be sure, the Fourth Amendment does not necessarily "require[ ]
             officers to delay their fire until a suspect turns his weapon on them,"
21              and "[i]f the person is armed—or reasonably suspected of being
             armed—a furtive movement, harrowing gesture, or serious verbal
22              threat might create an immediate threat."  *George*, 736 F.3d at 838.
             But where, as here, a jury could find that no such movement
23              occurred, our cases clearly establish that the use of deadly force
             would be impermissible.  *Id.*; *accord Curnow*, 952 F.2d at 325; *Cruz*,
24              765 F.3d at 1079.  We therefore affirm the district court's denial of
             qualified immunity to Montoya and Johnson at this stage of the
25              litigation.

26  51 F.4th at 888.

27

28  [11]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
36-3(b).

1   the use of deadly force would be impermissible"); *Gelhaus*, 871 F.3d at 1021 ("Because

2   [officer's] entitlement to qualified immunity ultimately depends on disputed factual issues,

3   summary judgment is not presently appropriate.").  Accordingly, the court will deny defendants'

4   motion for summary judgment as to plaintiff's Fourth Amendment excessive use of force claim

5   brought against defendants Abedrabbo and Miller.

6          2.      *Monell* Liability

7          Defendants have also moved for summary judgment in favor of defendants City of Elk

8   Grove and the Elk Grove Police Department as to plaintiff's 42 U.S.C. § 1983 claim pursuant to

9   *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Doc. No. 13 at 18), which appears

10  to be predicated on a ratification theory of entity liability (Doc. No. 17 at 15–16).  In opposing

11  summary judgment, plaintiff asserts that the entity defendants ratified the wrongful shooting of

12  plaintiff (*id.*) because the City of Elk Grove exonerated the defendant officers after an internal

13  administrative investigation.  (PUDF ¶ 28; 17-2 at 4.)

14         "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other

15  words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."

16  *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 445 (9th Cir. 2010) (quoting *Monell*, 436 U.S. at

17  691); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  To prevail on his

18  *Monell* claim against the city, plaintiff "must demonstrate that an 'official policy, custom, or

19  pattern' on the part of [the city] was 'the actionable cause of the claimed injury.'"  *Tsao v. Desert*

20  *Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533

21  F.3d 1010, 1022 (9th Cir. 2008)); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247

22  (9th Cir. 2016) (stating that to establish municipal liability under § 1983, a plaintiff must show a

23  direct causal link between the municipal policy or custom and the alleged constitutional

24  violation).

25         A municipality may be liable under § 1983 if "the individual who committed the

26  constitutional tort was an official with final policy-making authority or such an official ratified a

27  subordinate's unconstitutional decision or action and the basis for it."  *Rodriguez v. Cnty. of Los*

28  *Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018) (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d

1086, 1097 (9th Cir. 2013)).  Ratification is generally a fact question for the jury, but "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).  "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"  *Id.* at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. at 127).  "The mere failure to discipline [employees] does not amount to ratification of their allegedly unconstitutional actions."  *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015); *see also Dodge v. Evergreen School Dist. #114*, 56 F.4th 767, 788 (9th Cir. 2022); *Oakry v.  City of Tempe*, No. 20-cv-01167-PHX-JAT, 2021 WL 8155158, at *6 (D. Ariz. May 18, 2021) ("[I]t is well-settled in this circuit that without 'something more,' a City's failure to discipline an officer, or its finding that an officer's conduct did not violate policy, does not amount to ratification."); *Mueller v. Cruz*, No. 13-cv-01274-CJC-JCG, 2015 WL 9455565, at *3 ("[C]ourts in this circuit have stopped short of holding that a plaintiff can prove *Monell* liability simply on the basis of a defendant department's post-incident ratification through failure to discipline or take other action concerning the officer directly involved.").

Here, plaintiff has not established a genuine issue of material fact with regard to whether any policymaker knew of the defendant officers' actions "before the alleged constitutional violations ceased."  *Christie*, 176 F.3d at 1239.  Rather, plaintiff's *Monell* claim is based on an Elk Grove Police Department supervisor's exoneration of defendants Miller and Abedrabbo *after* their alleged use of excessive force.  (Doc. Nos. 1 at ¶ 17; 17 at 15–16; 17-2 at 69.) Consequently, a violation of plaintiff's constitutional right to be free from excessive force was not *caused* by the purported actions of any policymaker at the Elk Grove Police Department, as is required by *Monell*.  *See Mueller*, 2015 WL 9455565, at *3 (holding that *Monell* liability could not be established based on the plaintiff's allegation that the officer in question was exonerated after the alleged use of excessive force occurred); *Chavez v. City of Hayward*, No. 14-cv-00470-DMR, 2015 WL 3833536, at *8 (N.D. Cal. June 19, 2015) ("Chief Urban's exoneration of the Defendant Officers took place after the alleged use of excessive force; therefore, her action did

1  not result in or cause the violation of Plaintiff's constitutional right to be free from excessive

2  force.").

3      Accordingly, the court will grant defendants' motion for summary judgment on plaintiff's

4  § 1983 constitutional claim brought against the Elk Grove Police Department and the City of Elk

5  Grove under *Monell*.

6      3.   <u>State Law Claims</u>

7      Defendants also move for summary judgment in their favor on plaintiff's state law claims.

8  (Doc. No. 13 at 19.)

9          a.   *Bane Act Claim*

10     The Bane Act provides a right of action to "[a]ny individual whose exercise or enjoyment

11  of rights secured by the Constitution or laws of the United States, or of rights secured by the

12  Constitution or laws of [California] has been interfered with" by another person's "threats,

13  intimidation, or coercion." Cal. Civ. Code § 52.1(b)–(c).  To prevail on a claim for violation of

14  the Bane Act, a plaintiff must show "a specific intent to violate the arrestee's right to freedom

15  from unreasonable seizure." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)

16  (citing *Cornell v. City of San Francisco*, 17 Cal. App. 5th, 766, 801 (2017)).  A "mere intention to

17  use force that the jury ultimately finds unreasonable—that is, general criminal intent—is

18  insufficient." *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)).

19  Instead, "the jury must find that the defendants intended not only the force, but its

20  unreasonableness, its character as more than necessary under the circumstances." *Id.* (internal

21  quotations omitted).  However, it is not necessary for defendants "to have been thinking in

22  constitutional or *legal terms* at the time of the incidents, because a reckless disregard for a

23  person's constitutional rights is evidence of a specific intent to deprive that person of those

24  rights." *Id.* (internal quotations omitted).

25     The inquiry into specific intent focuses on:  (1) whether "the right at issue [was] clearly

26  delineated and plainly applicable under the circumstances of the case"; and (2) whether the

27  "defendant commit[ed] the act in question with the particular purpose of depriving the citizen

28  victim of his enjoyment of the interests protected by that right[.]" *Sandoval v. Cnty. of Sonoma*,

24

1   912 F.3d 509, 520 (9th Cir. 2018) (citation omitted).  If both requirements are met, "specific

2   intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act'

3   but instead acted in 'reckless disregard' of the constitutional right." *Id.* (quoting *Cornell*, 17 Cal.

4   App. 5th at 803).

5          Here, defendants argue that they are entitled to summary judgment in their favor on

6   plaintiff's Bane Act claim because there is no evidence before the court on summary judgment

7   that the defendant officers possessed the requisite "specific intent" to violate plaintiff's rights.

8   (Doc. No. 13 at 20.)  The court disagrees.

9          Plaintiff's claim against defendants for violation of the Bane Act is based on the same

10   alleged facts as his claim of use of excessive force in violation of the Fourth Amendment.  The

11   court has concluded that, viewing the evidence in the light most favorable to plaintiff, a

12   reasonable juror could conclude that the defendant officers acted unreasonably under the Fourth

13   Amendment when they shot plaintiff.  From this same evidence, a reasonable juror could

14   conclude that the defendant officers acted in reckless disregard for plaintiff's rights.  *See Taylor v.*

15   *Cnty. of Calaveras*, No. 1:18-cv-00760-BAM, 2020 WL 7406527, at *17 (E.D. Cal. Dec. 17,

16   2020) ("Because Plaintiffs' Bane Act claims are, at a minimum, predicated on the same facts as

17   the unlawful entry, arrest and excessive force claims . . . , and genuine disputes of fact exist with

18   respect to those claims, summary judgment cannot be granted."); *Est. of Smith v. Holslag*, No. 16-

19   cv-02989-WQH-MSB, 2020 WL 7863428, at *11 (S.D. Cal. Dec. 31, 2020), *aff'd and remanded*,

20   No. 21-55073, 2022 WL 1224001 (9th Cir. Apr. 26, 2022) (finding that because the Bane Act

21   claim was based on the same facts as the Fourth Amendment claim, and because the court had

22   already found that a reasonable juror could conclude that the defendant officer acted unreasonably

23   under the Fourth Amendment when he shot and killed the decedent, a reasonable juror could

24   conclude from those same facts that the defendant officer acted in reckless disregard of the

25   decedent's rights.).  Accordingly, defendants' motion for summary judgment in their favor with

26   respect to plaintiff's Bane Act claim will be denied.

27   /////

28   /////

1

          b.     *Negligence Claim*

2          Defendants also argue that they are entitled to summary judgment in their favor on

3   plaintiff's negligence claim because plaintiff has produced no evidence suggesting any negligence

4   on the part of the defendant officers.  (Doc. No. 13 at 20.)  Furthermore, they argue that "it cannot

5   be disputed that all officers only shot at Tucker after he refused to comply and instead reached for

6   his loaded handgun in his waistband."  (*Id.* at 21.)  As discussed in detail above, the court has

7   determined that based upon the evidence presented on summary judgment, triable questions of

8   material fact exist with respect to whether defendants' version of the relevant facts is true, as well

9   as to the reasonableness of the defendant officers' actions.  Therefore, defendants' argument in

10   support of their motion for summary judgment on plaintiff's negligence claim is unavailing.  *See*

11   *Banks v. Mortimer*, 620 F. Supp. 3d 902, 935 (N.D. Cal. 2022) (noting that courts analyze

12   negligence claims "under the same rubric as § 1983 claims based on the Fourth Amendment").

13   Accordingly, the court will also deny defendants' motion for summary judgment in their favor as

14   to plaintiff's negligence claim.

15          c.     *Other State Law Claims*

16          Defendants summarily argue in their motion that they are entitled to summary judgment in

17   their favor as to plaintiff's remaining state law claims (violation of Article I § 13 of the California

18   Constitution; violation of California Civil Code § 43; and battery) merely because they are

19   entitled to summary judgment on plaintiff's § 1983 claims.  (Doc. No. 13 at 19.)  Because the

20   court has concluded that defendants' motion for summary judgment as to plaintiff's § 1983 claims

21   must be denied, defendants' argument with respect to plaintiff's remaining state law claims is

22   unpersuasive.  Accordingly, the court will also deny defendants' motion for summary judgment as

23   to plaintiff's remaining state law claims.

24                          **CONCLUSION**

25          For the reasons explained above,

26          1.     Defendants' motion for summary judgment (Doc. No. 13) is granted in part and

27                    denied in part as follows:

28   /////

a.   Defendants' motion for summary judgement in their favor as to plaintiff's 42 U.S.C. § 1983 claim brought pursuant to *Monell* against defendants City of Elk Grove and the Elk Grove Police Department is granted; and

b.   Defendants' motion is otherwise denied;

2.   Plaintiff's motion to strike (Doc. No. 16), which the court construed as plaintiff's evidentiary objections, is overruled; and

3.   Consistent with the initial scheduling order which still governs in this case, the "parties are ordered to file a Joint Notice of Trial Readiness not later than thirty (30) days" after the date of entry of this order.  (Doc. No. 4 at 5.)

IT IS SO ORDERED.

Dated:   **July 26, 2023**

UNITED STATES DISTRICT JUDGE